## Carr et al. v. Melone.

(Decided February 8, 1929.)

720

DOOLAN & DOOLAN for appellants.

JOSEPH J. HANCOCK for appellee.

OPINION OF THE COURT BY COMMISSIONER TINSLEY—
Affirming.

On February 2, 1927, the appellant Orah Adams and
C. W. McFerran, Jr., entered into the following written
contract:

"This contract made and entered into by and
between C. W. McFerran, Jr., Auctioneer, Citizens
Bldg., Louisville, Ky., party of the first part, and
Mrs. Orah Adams and Mrs. Murray C. Tiedeman of
Louisville, parties of the second part.

"Witnesseth: That for and in consideration of
the sum of One ($1) Dollar, each to the other paid,
the receipt of which is hereby confessed and ac-
knowledged, the parties of the second part place in
the hands of the party of the first part a certain tract
of or parcel of land described as follows: 102½
acres on the Henry C. Road near Anchorage. 6
room frame bungalow—1 tenant house—barn—water
in house, etc. Never failing water.

"First: Party of the first part, for and in consideration of 5% of the gross amount of sale, covenants with the parties of the second part to sell, at auction for the parties of the second part, the above described property. Said fee of 5% is to be paid in cash to party of the first part on day of sale at close of sale.

"Second: Party of the first part further agrees to arrange and direct all advertising matter, said advertising being paid for by the party of the first part.

"Third: Parties of the second part agree to quote no price to prospective buyers for the above described property, from the date of the contract until after the date of the auction sale, which is to be between the 2nd day of February, 1927, to February 20th, 1927.

"Fourth: It is understood and agreed by all parties hereto that the within described property is to be sold at public auction as herein provided, and that the highest price obtainable on sale day will be confirmed by the owner, regardless of what the price may be.

"Fifth: That the party of the second part agrees to make good and sufficient warranty deeds to all property sold under this contract.

"Sixth: The property mentioned herein will be sold on terms of—assume a loan of $7,500.00 with Federal Joint Land Stock Bank—balance cash.

"The heirs, executor, assigns of all the parties hereto are likewise bound by the terms of this contract.

"In witness Whereof we have hereunto set our hands and seals this the 2nd day of February, 1927.

"(Signed) ORAH ADAMS,
"MURRAY C. TIEDEMAN,
"C. W. McFERRAN, JR.
"Witness: MURRAY C. TIEDEMAN."

Pursuant to this contract McFerran advertised the property, and it was sold at auction February 15, 1927, when appellee became the purchaser at the price of $10,-112.25, and he executed the following contract of purchase, which had been theretofore signed by Mrs. Adams:

"This contract is to certify that Mrs. Orah Adams of Louisville, Ky., party of the first part, through Calvin W. McFerran, Jr., as agent and auc-

tioneer, has this day sold and Lindsay Melone (L. B. Melone) party of the second part has this day bought a certain lot of land and improvements thereon, situated in Jefferson County, Kentucky. Farm containing 102½ acres more or less, 6 room frame bungalow and all improvements.

"The consideration for the said land is the sum of $10,112.25, $500,00 of which is cash in hand on date of sale and signing of this contract, the receipt of which is hereby acknowledged, and the balance to be paid as follows: Assume a loan with the Joint Stock Land Bank of approximately $7,500, now $7,462.50, payable $262.50 July 1st, 1927, & Jan. 1st. A second loan held by Horace Melone of approximately $2,-500.00, now $2,127.50, payable $300 every year, bearing 6% interest, next note $327.50 due Jan. 19-27. The balance in cash on or before the 23rd day of February, 1927, when deed will be delivered.

"Deferred payments to bear interest at the rate of 6% per annum from date of deed, interest to be paid ―――― and a lien to be retained to secure the payment of the deferred payments. The failure to pay any interest or any note when due renders it all at once due, payable and collectable.

".Party of the first part agrees to make good and sufficient General Warranty deed, to the above described property within a reasonable length of time after the date of the contract.

"The purchaser agrees to pay all taxes for the year 1927.

"Witness our hand this 15th day of February, 1927. L. B. Melone (Party of the Second Part). Orah Adams.

"Witness: C. H. Schrader."

On February 23, 1927, the day fixed in the contract, appellee demanded of Mrs. Adams a deed in accordance with his contract of purchase, which was refused. He then instituted this action against Mrs. Adams and Carr and wife to require the Carrs to convey the property to him on the ground that they had taken a deed for it from Mrs. Adams with actual notice and knowledge of his prior purchase; alleging also the contract of employment of McFerran, the auction sale, his contract of sale and purchase, his offer to perform the contract, and Mrs. Adams' refusal or inability to perform.

The defendants, Mrs. Adams and the Carrs, filed separate answers, the first paragraph of which are traverses; and the second paragraphs allege that the Carrs were the highest bidders at the sale, and that, through a fraudulent arrangement between McFerran and appellee, the property was sold to appellee for a price below their bid; that McFerran practiced fraud on Mrs. Adams, and that the contract of sale was fraudulently procured and executed, for which they ask that the petition be dismissed. Demurrers to the second paragraphs of the answers having been overruled, replies were filed completing the issues.

After the proof was taken, Mrs. Adams filed an amended answer, in which she alleged that the contract of sale was not signed by her at the time of sale or thereafter, and that ''after said sale plaintiff caused the certain writing relied on by plaintiff as a contract of sale to be altered and modified, and changed the terms thereof over the signature of this defendant and without her knowledge or consent, erasing therefrom the original agreed terms of sale, changing same from a cash payment of $600 to $500, and also erasing therefrom the name of H. H. Hewitt and inserting in lieu thereof the name of L. B. Melone; that by reason thereof the alleged contract of sale was voided because same is of no force or effect''; and ''that plaintiff has never tendered to her or to anyone for her the agreed cash consideration for the alleged sale aforesaid, and has never complied with any terms or stipulations in any contract with this defendant.'' A demurrer to this pleading was overruled, and it was controverted of record.

The lower court rendered judgment in accordance with the prayer of the petition, and defendants have appealed, assigning as grounds for reversal: (1) Fraud practiced upon Mrs. Adams by McFerran in obtaining the contracts of employment and sale; (2) sharp practices, fraud, and unfairness of the auctioneer in making the sale; (3) that appellants Carr and wife had no notice of the purchase by Melone at the time they took their deed from Mrs. Adams; and (4) that no tender of the cash consideration was made by appellee.

■ (a) But little stress is laid by appellants in their brief on the charge of fraud on the part of McFerran in making the contract of employment; and, in our opinion, there is no testimony to sustain the charge. The evidence of both Mrs. Adams and her daughter, Mrs. Tiedeman,

shows that, while there had been a discussion between them and McFerran as to the amount they hoped to receive from the sale, and that it would take between $11,-000 and $12,000 to make Mrs. Adams "whole," yet there is no evidence that such sum was agreed upon as the upset price to be brought at the sale. Both Mrs. Adams and Mrs. Tiedeman testified that each of them read the contract of employment before it was signed and discussed its provisions before signing it; and Mrs. Tiedeman, on her cross-examination, says they were willing for the farm to go if it brought the indebtedness and McFerran's commission.

The testimony shows that this contract of sale was read aloud by McFerran to the persons assembled before the sale was had, and that Mrs. Adams and Mrs. Tiedeman were both present. If they expected the property to bring $12,000, they should have notified those present of that fact, and especially so since the contract so read to prospective bidders provides "the highest price obtainable on the sale day will be confirmed by the owner regardless of what that price may be."

(b) The contract of sale was signed in blank by Mrs. Adams some time before the sale, and she says it was explained to her by Mr. McFerran that it was necessary to have such a contract in order that the purchaser at the sale could sign it and be bound to take the property, and that she signed it and gave it to McFerran for that purpose. The contract was in part blank at the time; the amount to be paid in cash, $600, was stated, but the amount of the lien debts to be assumed and the installments thereof to be paid by the purchaser were not stated, "because," she says, "McFerran had to go to the banks and get that information," and this was written into the contract after Mrs. Adams had signed it. The changes and alterations complained of in this contract were made in this way: After the sale, it was ascertained that the indebtedness against the farm assumed by appellee amounted to $9,590, and this sum, with the cash payment of $600 provided in the contract, exceeded appellee's bid by the sum of $77.75. For this reason, the "6" in 600 was changed to "5," making the cash payment $500.

A Mr. Hewitt had been bidding for appellee when his bid of $10,112.25 was accepted and the property declared sold; the name of Hewitt was written into the contract as the purchaser. Upon McFerran's attention be-

ing called to the error, a line was drawn through Hewitt's name, and the name of appellee inserted as the purchaser. It is clear, therefore, that Mrs. Adams signed this contract expecting and authorizing McFerran to fill in the amount of indebtedness to be assumed by the purchaser of the property, and to have said contract executed by the purchaser at the sale. Under this state of case and the circumstances surrounding it as developed by the price bid for the property, was the changing of the cash payment from $600 to $500 such an alteration of the instrument as to void it? We think not. The change was made by McFerran. He was undoubtedly Mrs. Adams' agent. The contract was prepared and signed by her in blank for the purpose of carrying into effect the sale to be made thereafter, and to enable her agent to bind the purchaser at said sale. When it developed that the purchase price was less than the total of the proposed cash payment and the lien debts to be assumed, McFerran, as Mrs. Adams' agent, had the power, and was authorized by his employment, to make the terms of that contract comport with the facts and conditions of the sale, and to reduce the cash payment to such extent that the amount of it with the debts to be assumed would not exceed the total amount bid (and to be paid) by the purchaser.

In 6 C. J. 827, it is said:

"To complete an auction sale there must be a bidder, the property must be struck off or knocked down, and the person to whom it is struck off must complete his purchase by complying with the terms of the sale. In conducting the sale it is part of the auctioneer's duty to invite and excite the competition of bidding, and to dispose of the property to the highest bidder, and some measure of discretion is vested in him as to the precise method to be pursued in attaining that object."

And in Martin v. Mathis, 184 Ky. 20, 211 S. W. 198, it is said:

"But primarily and actively the auctioneer as a rule is the agent of the seller, and as to him his authority is generally more extensive, and may cover a time both before and after the sale. Frequently the property is put into his hands for sale, and all the details are left entirely to him. He is expected

to make all the arrangements by way of public advertisement and otherwise and to act fully at the sale, to receive the deposit from the purchaser and to carry the transaction to the end.''

To the same effect is the case of Speiss v. Martin, 192 Ky. 211, 232 S. W. 615.

The substitution of appellee's name for that of Hewitt, as purchaser, was not an alteration. It was simply correcting a mistake.

We conclude, therefore, that McFerran was authorized to change the cash payment from $600 to $500, and to substitute the name of appellee for that of Hewitt, as purchaser, in order to make the sales contract conform to the facts and real terms of the sale.

■ But it is urged that the manner of conducting the sale was unfair and fraudulent, in that bidding was stifled and others, including appellant Carr, prevented from bidding by McFerran's precipitous action in accepting a raise of 25 cents by appellee over appellant's bid of $10,112. This contention necessitates a recital of the facts as shown by the testimony.

The sale was had on the property on the day advertised, commencing about 2 p. m., and was concluded about 4 p. m. After the bidding had reached the sum of $10,000 the sale began to ''drag,'' and bids were made at small advances. Appellant Carr was bidding through a Mr. Odom, who says that Mr. Carr had authorized him to bid as high as $12,000, and through a field agent of McFerran named Schrader. Appellee, Melone, was bidding through a Mr. Hewitt. Mr. Carr, through the field agent, Schrader, made a bid of $10,112, and immediately left the sale, but says he instructed Schrader, if that bid was raised, to bid as high as $10,115. Schrader says no such instruction was given him. After this bid of Carr's was made, Hewitt bid for appellee $10,112.25. No further or higher bid was made, and the property was declared sold to Hewitt.

Appellants claim, and their witness say, no time elapsed or was given for any other bid; and that immediately after this bid by Hewitt the auctioneer cried ''sold.'' If this charge were sustained by the proof, it would amount to such a stifling of bidding as to indicate a fraudulent intention upon the part of the auctioneer. However, appellee and his witness say that from three to five minutes, and one witness says ten minutes, elapsed

between the bid and the time the auctioneer cried "sold," and that McFerran in the meantime endeavored to get other bids. Appellant's witness Odom admitted that "plenty of time". intervened between Hewitt's bid of $10,112.25 and the dropping of the auctioneer's hammer. The testimony of disinterested witnesses preponderates in favor of appellee's contention in this regard, and we are inclined to agree with the chancellor's finding, in holding that any failure to run the bidding higher was no fault of the auctioneer, but due solely to the inaction of appellant Carr and his agent, Odom. We are unable to perceive any fraud upon the part of McFerran or appellee in this. None has been proven, nor has any circumstance been shown from which a suspicion of fraud arises.

The mere fact that appellee's agent raised appellant's bid only 25 cents is not of itself sufficient to impute fraud, or to raise a suspicion of sharp prectice. This small raise was made openly, and there is no claim by appellant's agent Odom. or any of his witnesses, that they did not hear it; in fact, they all admit they did hear it, and, since it was a higher bid than that of appellant, McFerran was authorized to receive it and to cry it. Fraud is not to be presumed, it must be proven. Shacklette v. Goodall, 151 Ky. 20, 151 S. W. 23; Commonwealth, for Use, et al. v. Filiatreau, 161 Ky. 434, 170 S. W. 1182; Marksbury v. Taylor, 10 Bush, 519.

■ The proof is against appellant's claim that Carr purchased from Mrs. Adams without notice of appellee's prior purchase. Mr. Carr attended the sale. He testified that he knew the property "was knocked off to L. B. Melone;" and Mr. Schrader, cashier of the bank of Middletown, who acted as McFerran's clerk or field man, says Mr. Carr asked him a few hours after the sale to see appellee, and ascertain how much profit he wanted for the place, and telephoned him the next day to ascertain if he had seen Melone. This testimony is not contradicted.

Having taken a deed from Mrs. Adams with actual knowledge of appellee's prior purchase, appellant Carr holds the title in trust for appellee. In Speiss v. Martin, supra, it is said:

'      "It seems to be well settled that a person who takes a conveyance of the legal title to land with the knowledge that his grantor has agreed to sell to another, holds it subject to the equitable estate already.

vested in such intending purchaser. In other words the grantee is treated as a trustee for the vendee.''

And further along in the same opinion, quoting from Pomeroy on Contracts, sec. 465, it is said:

"The doctrine is well settled that when the vendor, after entering into a contract of sale, conveys the land to a third person who has knowledge or notice of the prior agreement, or who for any other reason is not a bona fide purchaser for value, such grantee takes the land impressed with the trust in favor of the original vendee, and holds it as trustee for such vendee, and can be compelled at the suit of the vendee to specifically perform the agreement by conveying the land in the same manner, and to the same extent, as the vendee would have been liable to do, had he not transferred the legal title. . . . ''

No tender to Mrs. Adams was necessary, even if it be conceded that none was made since she had, prior to the time fixed in the contract of sale for conveying the title to appellee, conveyed to appellant Carr. Bolen v. Jenkins, 167 Ky. 295, 180 S. W. 351.

Finding no error in the judgment appealed from, it is affirmed.